UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN W. KECK,

          Petitioner,              CASE NO. 4:23-CV-12432

v.                              HON. F. KAY BEHM
                                    U.S. District Judge

JOHN DAVIDS,

          Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION
FOR A WRIT OF HABEAS CORPUS AND GRANTING
<u>PETITIONER A CERTIFICATE OF APPEALABILITY</u>**

Allen W. Keck, ("Petitioner"), currently incarcerated at the Ionia

Correctional Facility in Ionia, Michigan, filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, through counsel Joel David Kershaw.  Petitioner

challenges his conviction for first-degree child abuse, Mich. Comp. Laws

§ 750.136b(2), and being a second habitual offender, Mich. Comp. Laws § 769.10.

For the reasons that follow, the petition for a writ of habeas corpus is **DENIED**

**WITH PREJUDICE**.

## I.  Background

Petitioner was convicted following a jury trial in the Macomb County

Circuit Court.  This Court recites verbatim the relevant facts relied upon by the

Michigan Court of Appeals, which are presumed correct on habeas review

pursuant to 28 U.S.C. § 2254(e)(1).  *See Wagner v. Smith,* 581 F.3d 410, 413 (6th

Cir. 2009):

> Defendant's conviction arises from the physical abuse of his three-
> month-old daughter, CK.[1] On March 8, 2016, Jennifer Karaffa, the
> mother of CK, left home to go to work at 8:30 p.m., leaving CK and
> the couple's other 20-month-old child in the care of defendant.
> According to Jennifer, CK was fine when Jennifer left for work.
> However, after Jennifer returned home in the early morning of March
> 9, CK was crying and refused the formula that Jennifer attempted to
> feed her. Jennifer also noticed swelling on the baby's head, redness
> around the front of the child's head, and red bruising around the
> child's right eye. A few hours later, CK projectile vomited formula
> that Jennifer fed her. Defendant denied knowing what happened to the
> child. Jennifer took the child to her pediatrician, who directed her to
> take the child to the hospital.
>
> CK was diagnosed with fractures on both sides of her skull and a
> subdural hematoma, which is bleeding below the scalp. She also had a
> healed rib fracture and other more recent rib fractures, a fracture of
> her femur, and retinal hemorrhages. The child's treating physicians,
> who were the prosecution's medical experts at trial, attributed the
> injuries to shaking and nonaccidental blunt-force trauma. CK also had
> numerous retinal hemorrhages in her right eye and several in her left
> eye, which were attributed to nonaccidental head trauma.
>
> During the investigation, defendant and Jennifer suggested that their
> 20-month-old son could have caused the injuries because he was
> found a few days earlier sitting on CK's head. After defendant and
> Jennifer were advised that the 20-month-old child could not have
> caused the extent of the injuries, they attributed the injuries to
> Jennifer's 11-year-old daughter, GK, who had accidentally sat on
> CK's head a couple of weeks before CK's injuries were discovered.

---

[1] Because the victim, the other child witness, and a victim from petitioner's prior murder
case were minors at the time of the offenses, the Court will follow the Michigan Court of
Appeals' example and refer to them by their initials only to preserve their privacy. *See* Fed. R.
Civ. P. 5.2(a).

GK had also played a game, the "whee game," with CK that involved throwing and then catching the child in the air.

During trial, the prosecution presented evidence that defendant was also the father of three-month-old TK, who died in 1993 from nonaccidental blunt-force trauma, and that defendant had pleaded no contest to second-degree murder for that child's death.

The defense theory at trial was that the medical experts could not say with certainty when CK was injured, and that her injuries could have occurred up to two weeks before they were discovered, during which there were incidents of both defendant's 20-month-old child and GK accidentally sitting on CK. The defense argued that because it was not known when or how CK was injured, there was reasonable doubt whether defendant caused the injuries. The defense also argued that evidence of defendant's prior conviction should not be admitted at trial because defendant was only 16 years old when he was convicted of causing the death of TK, which involved a different type of injury—blunt-force trauma to the stomach—and there was no evidence of skull fractures or shaking in that case.

*People v. Keck*, No. 346077, 2022 WL 128582, at *1 (Mich. Ct. App. Jan. 13, 2022), *lv. den.* 509 Mich. 1054 (2022).

Petitioner seeks a writ of habeas corpus, alleging that he was denied the effective assistance of trial counsel.

## II. Standard of Review

Title 28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain habeas relief in federal court, a state prisoner is required to show that the

state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.,* at 103.

### III. Discussion

Petitioner argues he was denied the effective assistance of trial counsel.  To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.  *Id*.  In other words, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy.  *Strickland*, 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense.  *Id*.  To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'"

*Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 562 U.S. at 112).  The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance.  *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'"  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard."  *Harrington v. Richter*, 562 U.S. at 101.  Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664).  Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner.  *Id.*  This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and

6

latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Petitioner's main allegation is that trial counsel was ineffective for calling only one expert for the defense, Dr. Marcus DeGraw, a general and child abuse pediatrician, who had originally testified during the child protective proceedings against petitioner, as a defense expert in child abuse pediatrics. *People v. Keck, People v. Keck*, 2022 WL 128582, at *8. At trial, Dr. DeGraw testified that CK's skull fracture had been caused by either blunt-force trauma or crush-force trauma. Dr. DeGraw testified that he thought it was possible for CK's skull fracture to have been caused from a 100-pound child, like GK, accidentally sitting or falling on CK's head. He also agreed, however, that her injuries could have been caused by someone who was angry with the baby crying and slammed the baby down. Dr. DeGraw was the only defense expert to testify at trial. *Id.*

At a post-trial evidentiary hearing conducted pursuant to *People v. Ginther,* 390 Mich. 436 (1973), Petitioner presented additional witnesses who offered other views as to the cause of CK's injuries that differed from the prosecution experts. Defense counsel testified at the hearing that he used Dr. DeGraw as the only defense expert because he was familiar with Dr. DeGraw's testimony from the

earlier child protection proceeding.  Counsel consulted with Dr. DeGraw and believed that his testimony would generally be favorable to Petitioner.  Defense counsel also testified that he performed his own research of the issues and conferred with other attorneys.  *People v. Keck*, 2022 WL 128582, at *8.

Petitioner called four proposed expert witnesses at the *Ginther* hearing: (1) a pediatric neurologist (Dr. Joseph Scheller), (2) a biomechanical engineer (Dr. Roger Haut), (3) a clinical neurosurgeon (Dr. Ronald Uscinski), and (4) a pathologist (Dr. Douglas Smith).

Dr. Scheller testified that he believed CK likely had a pre-existing subdural hygroma well before she displayed the symptoms that led to her being taken to the hospital.  According to Dr. Scheller, CK's medical records indicated that she likely experienced fluid collection around the brain at between 1-2 months of age.  Dr. Scheller identified a potential cause of this fluid accumulation to be a minor trauma, such as "a short fall of a foot or two," something "that a parent might not even take special note of."  (ECF No. 5-15, PageID.2621-27).  According to Dr. Scheller, this minor accidental trauma was the cause of the fluid collection, which created excess pressure in the "system that connects the eye and the brain."  (*Id.*, PageID.2676-77).  Dr. Scheller conceded that this accumulation of fluid could not alone explain the skull fracture.  However, he opined that this could provide the environment in which the skull could be weakened such that another minor

8

accidental trauma could cause a fracture.  (*Id.*, PageID.2656-57).  Dr. Scheller

testified that based on his review of the records, the parents' explanation that CK's

slightly older [20-month year old] brother sat on her head a couple of days prior to

the symptoms manifesting themselves would also adequately explain all of CK's

injuries.  (*Id.*, PageID.2705).

Dr. Scheller conceded that he has only testified for the defense and he shares

a minority opinion that rapid acceleration/deceleration can cause injuries

qualifying as abusive head trauma.  In fact, Dr. Scheller admitted that his opinion

is shared by only five percent of the relevant medical professional community. (*Id.,*

PageID.2692-94).  Dr. Scheller admitted that he did not consider CK's other

injuries (rib and femoral fractures) in reaching his opinion.  (*Id.*, PageID.2714-15).

Dr. Haut, who is not a medical doctor, but is a biomechanical engineer, also

looked at the likelihood that CK's skull fracture was caused by her older brother

sitting or falling on her head.  Dr. Haut believed that the skull fracture was caused

by a crushing type of injury and not a striking type of injury.  (ECF No. 5-16,

PageID.2766-68).  According to Dr. Haut, "a drop from six inches of a . . . 30-

pound child [onto CK's head is sufficient] to crush the skull and cause fractures."

(*Id.*, PageID.2768-69).

Dr. Haut admitted on cross-examination that: (1) he is not a medical doctor,

let alone a pediatrician, (2) his experiments have only been performed on

"porcelain model[s]" not infant cadavers or skeletons, (3) he has never been a part of a child abuse review team, and (4) he has no practical or clinical medical training.  (*Id*., PageID.2777-78).  Dr. Haut further acknowledged that in reaching his opinion as to the likely cause of CK's injuries, he relied solely on "two CT screenshots, some of the testimony, very little of it, the picture of the crib, the picture of the infant two weeks before the incident, and [his] discussions with [appellate counsel]."  (*Id.,* PageID.2783).  Dr. Haut admitted that his opinion addressed only CK's cranial fracture, meaning he ignored any and all of the other injuries including the bruising on CK's eyelid, CK's posterior and third and fourth rib fractures, the corner fracture on the backside of CK's left femur, and the multi-layered retinal hemorrhages in CK's eyes.  (*Id.,* PageID.2783-85, 2794).

Like Dr. Scheller, Dr. Uscinski testified that he believed that CK had begun to experience fluid collection around the brain, also known as a subdural hygroma, long before she was examined at the hospital.  Unlike Dr. Scheller, Dr. Uscinski believed that the subdural hygroma was "most likely related to birth."  (ECF No. 5-17, PageID.2862-83).  Dr. Uscinski believed that the skull fracture may have also been a couple of months old by the time CK was taken to the hospital.  (*Id.,* PageID.2882).  Dr. Uscinski testified that with the passage of time, these conditions having gone unnoticed could reasonably have culminated in "lethargy, vomiting, maybe a seizure or an epileptic convulsion," such that it "wouldn't

surprise me that a child would have a sudden change" such as CK experienced shortly before she was taken to the hospital. (*Id.*, PageID.2884-85). Dr. Uscinski also explained that retinal hemorrhaging was consistent with this explanation and was likely caused by "increased intracranial pressure." (*Id.*, PageID.2900-01).

On cross-examination, the prosecutor confronted Dr. Uscinski with a long list of criminal cases in which he provided testimony similar to that in this case, namely, that minor trauma caused a rebleed to a birth injury, which lead to later head trauma in children. (*Id.*, PageID.2890-93). Dr. Uscinski admitted that after his numerous testimonies to that effect, "50 physicians signed a letter stating that minor trauma caus[ing] a rebleed of an earlier head injury can be best characterized as inaccurate contrary to vast clinical experience and unsupported by any published literature." (*Id.,* PageID.2893). He further conceded that the letter outlined that "[t]he rebleed theory in infants is a courtroom diagnosis not a medical diagnosis" that the jury properly rejected. (*Id.*) Dr. Uscinski also admitted that he had been censured by the American Association of Neurological Surgeons for "giving bias[ed] testimony on chronic rebleeding in chronic subdural hemorrhages in six other criminal cases[.]" (*Id.*, PageID.2893-94).

Dr. Smith's testimony was basically limited to the types of expert witnesses that are needed in child abuse cases. (ECF No. 5-17, PageID.2943).

At the *Ginther* hearing, Dr. DeGraw discounted Dr. Scheller's opinion that CK could have suffered chronic bleeding in her brain, which led to her susceptibility to skull fractures:

> Again, the fact that you have a - - you have subdural and bleeding of a chronic nature that increases the head circumference size has never been shown to make the child more susceptible to skull fractures from minor trauma. It doesn't fit.
>
> In addition, the more you add of unlikely natures in the same child, the more unlikely that combination of factors actually occurred. And, so, no, I would not subscribe to any theory that would say a child who had chronic subdural bleeding was then more susceptible to skull fractures on both sides of their skull from some kind of minor trauma. Almost certainly they occurred at the same time, through the same mechanism through the forces we have discussed multiple times.

(ECF No. 5-17, PageID.2931).

Dr. DeGraw also discounted Dr. Uscinski's opinion that CK's injuries were explained by a birth trauma and a chronic hematoma rebleeding:

> No, in multiple ways. Primarily, a general pediatrician's job primarily in a normal sense is following growth and development of children, and that applies in this case because with a head injury, especially that with blood on the inside of the head, the head circumference changes. In this case, the head circumference jumped, significantly jumped between the two-month visit and the three-month visit. Other experts have said it is a gradual increase or it would change from birth, and that isn't the case. It jumped significantly from two months to three months. That - - that is important in this case. Combine that with the fact that you have bilateral skull fracture, which other experts have agreed, including the biomechanical engineer, it had to have occurred from a specific mechanism like crush or blunt force impact or a vertex impact to cause bilateral parietal skull fractures. Never, ever has it been shown in the scientific literature or clinical experience to occur during a C-section. Um, that doesn't exist together in a case like this.

12

When you combine that with the findings that suggest the injuries are chronic, um, it does fit the time frame of it having occurred between two months of age and this presentation, which also coincides with all the other evidence in this case. All of that together does not co-exist with birth trauma, and again, the specifics matter, and in this case, the skull fractures and the change of head circumference are the two key components that alter that. If those two were different, and if the head jumped significantly from birth, and there were no skull fractures, we may entertain the discussion of whether birth trauma enters the picture in this case, but it doesn't in this case because of those specific factors.

(*Id.*, PageID.2929-30).

At the conclusion of the *Ginther* hearing, the trial court judge rejected

Petitioner's ineffective assistance of counsel claim:

In this case, Defendant claims that his trial counsel was constitutionally ineffective because he failed to properly investigate the relevant medical issues and call additional expert witnesses to rebut the Prosecution's claim that CK's injuries resulted from intentional abuse—not an accident. Defendant asserts that [*People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015),] supports his contention. The Court disagrees. Unlike *Ackley*, Defendant's trial counsel testified that he reviewed several articles from medical journals regarding the medical issues raised in this case and was familiar with the controversy within the medical community regarding AHT [(abusive head trauma)]. Unlike *Ackley*, Defendant's trial counsel investigated the relevant medical issues and retained board certified child abuse pediatrician, Dr. Marcus DeGraw, who testified at Defendant's criminal trial that CK's injuries could have been accidental. Unlike *Ackley*, Dr. DeGraw never told Defendant's trial counsel "you don't want me as your defense expert" or refer him to another expert who may have been willing to offer more favorable testimony. Additionally, unlike *Ackley*, Defendant's trial counsel testified that he consulted other attorneys regarding the case.

Defendant's trial counsel testified at the evidentiary hearing that he knew that Dr. DeGraw had a good reputation and often testified for

13

the prosecution in child abuse cases, which he concluded enhanced Dr. DeGraw's credibility. Defendant's trial counsel stated that he spoke with Dr. DeGraw on the phone "a couple times" and was "very confident that Dr. DeGraw could handle the situation." Defendant's trial counsel eventually became concerned about Dr. DeGraw's testimony after the trial concluded because he believed it was not the same as his testimony at the parental rights termination trial. However, Defendant's trial counsel was unable to specifically identify any discrepancies.

On this record, the Court finds that Defendant has failed to overcome the strong presumption that his trial counsel's decision to retain and call Dr. DeGraw as his only expert witness was objectively unreasonable [sic]. Because Defendant is unable to establish that his trial counsel's performance was constitutionally deficient with respect to his decision to rely on Dr. DeGraw as his only expert witness, it is unnecessary to address the parties' arguments regarding whether there is a reasonable probability that the outcome of the trial would have been different but for his trial counsel's performance.

*People v. Keck,* 2022 WL 128582, at *8-9.

The Michigan Court of Appeals also rejected petitioner's claim as follow:

We agree with the trial court that this case is distinguishable from *Ackley*. First, defense counsel did not rely on an expert who did not support the defense theory. Dr. DeGraw explained to the jury that CK's injuries could have resulted from a crushing injury, not necessarily blunt-force trauma, which might have occurred when GK or the 20-month-old baby sat on the child's head, raising possible doubt over the cause of her injuries. He also placed the timing of the injuries earlier than when defendant was caring for CK on March 8, and noted that the subdural hematoma was a chronic condition, not an acute one, raising possible doubt over who was responsible for the injuries.

Even though Dr. DeGraw agreed that he could not rule out blunt-force trauma and someone intentionally striking the child as a cause of her injuries, he was able to explain why the injuries could have been caused by other events in CK's life, and thereby casting doubt over

14

what or who caused the injuries. Unlike in *Ackley*, this was not a case where defense counsel deferred to the opinion of an expert whose views were not supportive of the defense's theory. In fact, it was reasonable to believe that the jury might find Dr. DeGraw more credible because he was willing to concede that blunt-force trauma could be a possible explanation for the child's injuries. It was the prosecution's burden to prove that CK's injuries were nonaccidental, but defendant did not have a burden to prove an accidental injury. Accordingly, defense counsel was not required to eliminate all nonaccidental explanations for the injuries, but only required to raise a reasonable doubt over what could have caused CK's injuries. Dr. DeGraw's testimony served that purpose by explaining how CK's injuries could have been accidentally caused by acts committed by either GK or defendant's 20-month-old son.

The record also does not support defendant's claim that defense counsel failed to properly review either Dr. DeGraw's earlier testimony or the medical literature when preparing for trial. Dr. DeGraw's testimony at the child protective proceeding was generally consistent with his trial testimony in that he explained that there were possible accidental causes for CK's injuries, thereby raising doubt over whether defendant could have been the only person to inflict the injuries.

Furthermore, defendant has not shown that defense counsel performed deficiently by not doing more or consulting other experts before deciding to only use Dr. DeGraw. Dr. DeGraw's previous testimony provided defense counsel with a good understanding of what his testimony would be and how it would aid the defense's case. In contrast, if he had called another expert who had not previously testified, it is possible that their testimony might have been more problematic or questionable for the defense. Additionally, the proposed experts who defendant produced at the evidentiary hearing had divergent views that did not necessarily support or mesh with Dr. DeGraw's testimony, which may have confused the jury. It was a matter of strategy whether to offer additional expert testimony to supplement Dr. DeGraw's testimony and defendant has not shown that counsel's decision was objectively unreasonable.

*People v. Keck,* 2022 WL 128582, at *10.

With respect to Petitioner's claim that trial counsel was ineffective for failing to call additional expert witnesses for the defense, the Supreme Court has noted that a counsel's strategic decision as to whether to hire an expert is entitled to a "'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021). The strong presumption of the reasonableness of counsel's strategic decisions, when a claim of ineffective assistance of counsel involves a decision on whether to hire an expert, recognizes that defense lawyers have limited time and resources, and so must choose from among a number of strategic options, and such decisions are particularly difficult because certain tactics run the risk of harming the defense by undermining credibility with the jury or distracting from more important issues. *Id.* "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. at 111. The selection of an expert witness by a defense attorney is a "paradigmatic example" of the type of strategic choice that, when made after thorough investigation of the law and facts, is "virtually unchallengeable" under *Strickland*. *Hinton v. Alabama*, 571 U.S. 263, 275 (2014).

Petitioner's trial counsel did consult with, and call Dr. DeGraw to testify as an expert for the defense. Dr. DeGraw provided testimony to support the defense theory that CK's injuries could have been caused by an accident, such as a larger

child falling on her head. Both the trial court and the Michigan Court of Appeals

concluded that counsel was able to sufficiently present Petitioner's defense theory

through the testimony of Dr. DeGraw and was thus not ineffective for failing to

call additional expert witnesses.

The question for this Court on habeas review is whether any fairminded

jurist could agree with the trial court and the Michigan Court of Appeals that

counsel's failure to seek additional expert witnesses to rebut the prosecution's

theory that CK's injuries were the result of physical abuse by Petitioner satisfied

the reasonableness standard enunciated in *Strickland*. *Davis v. Carpenter*, 798

F.3d 468, 473 (6th Cir. 2015). "That standard is a general one, governing a great

blue-water of attorney conduct: from pre-trial discovery to plea-bargaining, from

in-court trial tactics to post-verdict motions, from direct appeals to post-conviction

challenges. The Supreme Court has charted only parts of that expanse." *Id.* The

Sixth Circuit in *Davis* concluded that when faced with the question of whether trial

counsel was ineffective for failing to seek additional experts to support the defense

theory that the victim in that case had died after being accidentally dropped, the

Tennessee Court of Appeals found itself in "open water.":

> The Supreme Court has never reached the specific questions that the
> Tennessee courts answered in this case: how many experts must an
> attorney contact before proceeding without one, what kinds of outside
> advice can the attorney rely upon, and ultimately how hard must he try.
> The only buoy in sight, far off on the horizon, was the Court's guidance
> in *Strickland* itself that counsel's efforts must be within "the wide range

17

of reasonable professional assistance [.]" 466 U.S. at 689, 104 S.Ct. 2052.  That rule is as general as they come. And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

*Id.,* at 473–74.

The Sixth Circuit found that the Tennessee Court of Appeals did not unreasonably apply *Strickland* by concluding that trial counsel's efforts to find a medical expert to testify at a second murder trial that the infant's fatal injuries could have been sustained when the habeas petitioner accidentally dropped his child were professionally reasonable.  *Id.* at 474.  Counsel tried to convince an expert from the first trial to testify at the second trial, and worked side-by-side with the first expert's attorney to find another expert when the first expert refused to testify at the second trial.  Counsel also called one or two doctors himself.  *Id.* Although the Sixth Circuit acknowledged that trial counsel could have done more than he did to find another expert, fairminded jurists could conclude that counsel's efforts to find an expert "fell in the permissible zone between 'best practices' and outright incompetence."  *Id.*

The Sixth Circuit numerous times has held that trial counsel is not ineffective for failing to call more than one expert witness for the defense.  *See Wesson v. Shoop,* 847 F. App'x 325, 332 (6th Cir. 2021) (Counsel's decision not to present more expert testimony regarding a link between the defendant's mental

limitations and his crimes during his sentencing in capital murder trial was reasonable, and, thus, did not amount to ineffective assistance of counsel, where proposed expert and expert who testified reached essentially same conclusions, and expert who testified did testify about link between defendant's mental limitations and his crimes); *Hanna v. Ishee*, 694 F.3d 596, 618–19 (6th Cir. 2012) (counsel was not ineffective in investigating and presenting mitigation testimony from prison life expert during sentencing phase of capital murder prosecution, arising from fatal stabbing of defendant's cellmate; counsel obtained all of defendant's medical, hospital, institutional, school, and employment records, counsel hired clinical psychologist, who interviewed defendant, reviewed his records, and testified, psychologist's testimony referenced defendant's records, demonstrating that the effects of his organic neurological defects, troubled childhood, and his long-term incarceration were considered as part of her psychological assessment, and additional expert testimony or other prison life evidence would have been cumulative); *Caudill v. Conover*, 881 F.3d 454, 463-64 (6th Cir. 2018) (trial attorney did not provide ineffective assistance at penalty phase of defendant's capital murder trial by not calling second expert to testify about her brain damage, where that expert's report contradicted key and powerful theme of her mitigation case, and other expert already testified about her brain damage).

19

Petitioner also attacks trial counsel's decision to call Dr. DeGraw, citing to the fact that Dr. DeGraw often testified as an expert for the prosecution. Defense counsel had testified at the *Ginther* hearing that he thought that the fact that Dr. DeGraw testified at times as a prosecution expert would enhance his credibility with the jurors as an expert for the defense. Counsel's decision to call Dr. DeGraw as a defense expert, even though he had testified in the past for the prosecution, is a reasonable defense strategy that defeats Petitioner's ineffective assistance of counsel claim, particularly where Dr. DeGraw had provided helpful testimony for Petitioner. *See Thomas v. Taylor*, 170 F.3d 466, 473 (4th Cir. 1999). Trial counsel was not ineffective for failing to call Petitioner's proposed expert witnesses because their testimony would have not only conflicted with Dr. DeGraw's findings, but in some respects, these proposed experts' opinions conflicted with one another. Dr. Scheller and Dr. Uscinski provided conflicting alternate opinions involving the time frame for CK's injuries, with Dr. Scheller providing a time frame of between two and three months and Dr. Uscinski believing that the time frame started at birth. A trial attorney is not ineffective for failing to call expert witnesses who would have offered conflicting or contradictory opinions. *See Owens v. Lamarque*, 283 F. App'x 566, 568 (9th Cir. 2008); *Thomas v. Taylor*, 170 F.3d at 473.

Moreover, all of Petitioner's proposed experts were impeached by the prosecutor at the *Ginther* hearing, particularly concerning their credentials and the fact that none of them had taken CK's other injuries into account in determining that she had not been the victim of child abuse. This suggests that their credibility could have been seriously attacked had they been called to testify at trial. Calling these experts to testify at trial carried the risk of harming Petitioner's defense because it could have undermined the defense's credibility with the jury. *Dunn v. Reeves*, 594 U.S. at 739.

Finally, in light of the overwhelming additional evidence of child abuse in this case, as well as evidence that Petitioner had previously been convicted of second-degree murder involving the physical abuse of another child, Petitioner is unable to show that he was prejudiced by counsel's failure to call additional expert witnesses.

In order to establish prejudice from counsel's failure to consult with or call an expert witness, a habeas petitioner must show the "likelihood of a different result" is "substantial, not just conceivable." *See Maze v. Lester*, 564 F. App'x 172, 183 (6th Cir. 2014). Considering the compelling evidence of physical abuse in this case, particularly where there is no indication that these proposed experts offered adequate alternative explanations for CK's other injuries or the fatal injuries suffered by TK, there is no reasonable probability that the result of the trial

would have been different had these additional experts been called to testify for the defense. Petitioner is therefore unable to prevail on his ineffective assistance of counsel claim. *See, e.g., Lutze v. Sherry*, 392 F. App'x 455, 459-60 (6th Cir. 2010) (Murder defendant was not denied effective assistance by appellate counsel's failure to raise trial counsel's failure to challenge shaken baby syndrome (SBS) evidence, where there was no reasonable probability that the result of the trial would have been different had the SBS evidence been challenged).

Petitioner claims that trial counsel was ineffective for failing to provide Dr. DeGraw with certain materials so that he could adequately prepare for trial. A defense attorney should work "closely with anyone retained as a defense expert to insure that the expert [is] fully aware of all facts that might be helpful to the defendant." *Glenn v. Tate*, 71 F.3d 1204, 1210, n. 5 (6th Cir. 1995).

The Michigan Court of Appeals rejected this claim as follows:

> Defendant also argues that defense counsel was ineffective for not providing Dr. DeGraw with the images of CK's retinal hemorrhages. However, Dr. DeGraw testified that he deferred to the visual observations and opinion of the pediatric ophthalmologist because that doctor evaluated the child in person and that the photographs of the retinal hemorrhages were consistent with the pediatric ophthalmologist's reported findings. Additionally, Dr. DeGraw was able to use the findings by the treating pediatric ophthalmologist in making his assessment of this case. Defendant has not shown that providing the retinal images to Dr. DeGraw would have allowed him to expand upon his testimony, and thus has not shown that he was prejudiced by counsel's failure to provide the retinal images to Dr. DeGraw.

22

*People v. Keck*, 2022 WL 128582, at *11.

Petitioner has offered no argument as to how Dr. DeGraw's testimony would have been different had he been provided with the retinal images. The Michigan Court of Appeals' decision is reasonable, precluding habeas relief.

Petitioner finally alleges that defense counsel was ineffective by failing to effectively impeach Dr. Gianfermi's testimony regarding when CK's retinal hemorrhaging could have happened. At trial, Dr. Gianfermi testified that she believed that the retinal hemorrhaging was caused by injuries that occurred from zero to seven days earlier. Although defense counsel attempted to impeach this testimony by showing that she had given a different timeline in previous testimony at a hearing in a child protective proceeding, in which she stated that it could have happened up to 14 days earlier, counsel did not confront Dr. Gianfermi with the transcript from the prior hearing when she denied making that statement.

Impeachment strategy falls within the category of an attorney's trial tactics that are difficult to attack. *Tackett v. Trierweiler*, 956 F.3d 358, 374 (6th Cir. 2020). Although the Michigan Court of Appeals agreed that trial counsel had been ineffective for failing to confront Dr. Gianfermi with her prior testimony, the Court did not believe that this affected the outcome of the trial:

> However, we are not persuaded that there is a reasonable probability that proper impeachment on this limited issue affected the outcome of defendant's trial. At trial, Dr. Gianfermi placed the age of the retinal hemorrhages at 0 to 7 days old. That would have meant that the

injuries that caused the retinal hemorrhages could have occurred as early as March 1 or 2. When GK admitted playing the "whee game" with CK, she did not give a time or date. Additionally, GK indicated that she accidentally sat on CK sometime before February 27, 2016, but she did not provide a specific date or timeline. In any event, the testimony also indicated that it was difficult to determine an accurate timeline for when the retinal hemorrhages occurred. Further, the hemorrhages were also part of a larger constellation of other symptoms that were the subject of other timeline testimony that was explored in depth at trial. Therefore, it is not reasonably probable that the outcome of defendant's trial would have been different had defense counsel successfully impeached Dr. Gianfermi's limited testimony regarding the estimated ages of the retinal hemorrhages.

*People v. Keck*, 2022 WL 128582, at *6.

In light of the foregoing, Petitioner has failed to identify how additional impeachment of Dr. Gianfermi's testimony would have affected the jury's decision.  Defense counsel did not perform ineffectively by not more forcefully cross-examining the doctor, particularly when the effect of further probing was entirely speculative on Petitioner's part.  *See Jackson v. Bradshaw,* 681 F.3d 753, 764-65 (6th Cir. 2012).  Petitioner is not entitled to relief on his claim.

## IV.  Conclusion

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial

showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Moreover, a habeas petitioner's ineffective assistance of counsel claim must make a substantial showing of the denial of a constitutional right so as to justify the issuance of a certificate of appealability. *See Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000). A habeas court should grant a certificate of appealability if jurists of reason could find it debatable that trial counsel had been ineffective. *See Phillips v. Pollard*, 587 F. Supp. 3d 627, 635 (E.D. Mich. 2021). Although the Court believes that it was correct in its ruling, the Court will grant a certificate of appealability to Petitioner because jurists of reason could find it debatable that trial counsel was ineffective. *Id.*

## V. ORDER

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus

(ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **GRANTED.**


      <u>s/F. Kay Behm</u>
      F. Kay Behm
Date: October 28, 2024      United States District Judge